Case before the court, case number 13-1625. Mr. Lee, are you going to go first or is Mr. Lee going to go first? I'm going to go first and what I've done is reserve five minutes for rebuttal. I will address the patent damages and trans issues. I would like to reserve five minutes. I'm going to try to save two minutes of my time for Mr. Newt. But we've agreed that if time is short and we're addressing something, we may get a point where we'll just submit. He and I will both submit on the brace on the license issue. But when I get too close to the two or three minute mark left, I may exceed it to Mr. Newt if I could. Okay. May it please the court. My name is Bill Lee and together with my partner, Warren Fletcher, we represent the appellants and defendants below. As we've said, I will address the patent damages and rand issues before the court. Although the jury awarded only approximately $10 million in damages, this case actually has implications that are much broader. I think the substantial participation of the meeting demonstrates that and there are really three reasons before I move to the substance of the patents for this court. Would you mind, at least speaking for myself, I appreciate that this is important and time is limited and there are a lot of issues. On the 215 patent, suppose that we agreed with you that the selected to minimize language had to be included in the claim construction. Do we know whether there is non-infringement under that revised claim construction or is that a matter that would have to be tried because the claim construction is changed? We know the answer to that question. And, Your Honor, I think, I'm hoping that in my argument time is going to each of the three patents, I can demonstrate to you that there is one claim limitation and one absolutely undisputed fact and that combination, the claim limitation and the undisputed fact, require determination non-infringement. On the 215, the claim limitation is the one I think Your Honor is talking about, but there are three parts to the claim limitation. It is responsive to the receiving step, constructing a message, including a type identifier field. There are three important portions to this. One is there is a time and an event that must occur before the message is constructed. That's the responsive. The second is the constructing of a message at that point in time and after the receipt. And the third is what are you constructing? And that's the reason for the claim construction dispute. Now, the undisputed fact would lead to non-infringement under either claim interpretation because here is the undisputed fact. The patent says we are distinguishing a static one-size-fits-all response. That's in the patent. Fred, I guess I'm trying to understand this. I took it that you had two essential points, the claim construction point about the constructing has to be done for the purpose of minimization, and then you have a point about how regardless of whether minimization has to be the basis for the constructing, the receiver actually has to have a choice. Suppose we didn't agree about the choice part, okay, because the choice part is enough if we agreed with it for you to win without regard to the minimizing, right? Because the receiver does not make a choice. It has a program that makes a choice. Correct. Create what the receiver can do. So what I'm trying to understand is on the claim construction issue, the choice part is not a claim construction issue, but on the claim construction issue or it's a construction of the construction issue, but the minimizing point, how do we know or what's the answer to the question?  But there's a requirement that the construction, which may be uniform across the board, always the same, be for minimizing. What does that mean for whether there is infringement or not? It means, Your Honor, I think I may have paused because our proposed construction, I think your use of the word choice, I think we use the word selecting, but if we call selecting and minimizing as the two aspects for our claim construction. So let me answer it this way. There is a district court's claim construction, which we say should have incorporated the ideas of selecting and minimizing. What is the focus on minimizing? If we focus on minimizing, we don't do that. We have a static one-size-fits-all response. It's the block acknowledgment, and there's a reason for that. The specification makes it very clear that the reason for having the overhead, because to make the minimization decision, you have to decide, should I use a bitmap, should I use a list? There's overhead. The specification says we're doing that because we're going to save bandwidth. But 802.11 doesn't need that, so it doesn't minimize. Is the language about minimizing, was that actually language that purposely distinguishes prior art? Yes. How so? Because, Your Honor, this goes back to my block acknowledgment. You're saying the prior art didn't try to minimize? The prior art actually had static responses, and if the court considers Column 3, Line 56 to 50, Column 3, Line 46 to 50 of the patent to 8278, the purpose of the invention is described to avoid a static use of a one-size-fits-all acknowledgment. And the whole purpose of the 215 patent is this. If you have a one-size-fits-all acknowledgment, you may be using more bandwidth than is required. So, what they do is there's a tradeoff. We'll have more overhead, but we'll end up using less bandwidth. 802.11n, and the record demonstrates this, doesn't have that bandwidth problem. So, it has a static block acknowledgment. So, we have exactly what is distinguished in the patent itself as a prior art. Here, this is an analogy that at least helped me understand it. This is a circumstance where... Can I ask you, doesn't the protocol that... I understand that it uses one specific way of sending, but at least the type identifier field is one specific way of doing it. But isn't that itself a way to minimize feedback response and protocol? You choose... There are four or five different options, I guess, in the table. And it could be that they... A device may pick from those, like your construction B. Why is it if the device pre-chooses from them, it's still minimizing feedback? Your Honor, to answer that question, the device isn't choosing at all. That's why, when I was answering Judge Toronto's question, putting the type identifier field in the context of responsive to the receiving steps and constructing, that's why that is so important, because the receiver is not doing any... No, I understand. You think your receiver does it, and the patent requires receivers that do, right? You have to make a choice in order to minimize. And this, Your Honor, if I could, this is the analogy that I would give you. If you invented the car, and the car had one speed, had one gear, and then someone came up and said, well, I have a new car, it has four speeds. One, drive one, drive two, drive three, drive four. And I'm distinguishing that because the prior art only had one speed, drive one. So, what I'm saying is, what the invention is, when you're in the car, you can judge the circumstances, and the driver, the receiver, can make a choice. Drive one, drive two, drive three, drive four. That's better. You're getting a little far field here, all right? So, was there a type identifier field in the prior art? Yes. Forget about the car. Yes. So, there was a type identifier field in the prior art. It's a static one. The acknowledgment was the static one-side fits all, which is at A278. And we have a static one-side fits all. Now, to go to Judge Hu's question, it is for sure chosen in the design of the product, which is why I think, you know, I didn't use the prior arts to get far field, but I think it matches. And this is where I'm struggling, because I think for you to prevail, we have to adopt your plain construction on reading the limitation from the preamble about minimizing and your interpretation of that in. Because otherwise, the responsive and constructing and things like that, that seems to me that your devices all do that. It gets data in, which is responsive to the receiving stuff. It constructs a message field to send back, which includes a number field, a link field, a contact field, and a type identifier field. Your type identifier field is always static. But the other stuff may not be. In fact, I'm sure the content field isn't static, because it's sending a message back about the errors and the data it received. So why isn't that responsive to the receiving stuff and then on down the line fulfilling all those limitations? Your Honor, because if you interpret the claim as you just described it, especially you cover what they described as a prior art, that would cover that static one-side fits all announcement. Because if I take Your Honor's analogy, there's a receiving step in your analogy. There's a message constructed, and it's a one-size-fits-all. You have just decided that the claim covers precisely what's described in the prior art. And I think that's the important point. You have to take the patent, the patentee at their word. They distinguish a one-size-fits-all response. We have a one-size-fits-all response, because we don't need to make the minimization decision. So whether you focus on the selecting portion of what we propose, you focus on the minimization portion, and you can adopt one or the two and at least the same result. Or frankly, if you use the district court's claim interpretation to take the patent at its word, this is the one fact that I don't think there's any dispute about. We have a one-size-fits-all static response. Can I shift gears here for a minute? 625, Petra's anticipation. If we decide that there is non-impringement, do we have to reach anticipation? I gather at least some of the defendants here filed counterclaims for invalidity judgments, and I guess got them. They got judgments that the patent was not invalid based upon. Right, right. So do we need to reach the anticipation question if we decide there is no infringement of 625? I think, Your Honor, there's both the practical and theoretical. Practical matter, I don't think. Practical matter, it's because you argue that your infringement argument and the anticipation argument are two sides of one coin. It's either one or the other. Isn't that right? I think you're right. Yes, I think on the invalidity side, to make it clear. On the non-infringement side, we surely argue that the claim requires the transmitter and the receiver to receive an out-of-sequence packet. And again, one fact, which is the 802.11 receivers receive all packets, in-sequence, out-of-sequence. There's no command. Dr. Nettles agreed to that. Right, but I mean, your argument is that if we agree with you on the 625 as it relates to infringement, then the same argument is made with respect to Petras, correct? Yes, Your Honor, but this is a slight difference. 802.11 is different because we don't have the deadlock problem. Since we receive all out-of-sequence or in-sequence packets, there's never a deadlock. Petras does describe the deadlock problem that's addressed in the 625 patent and has a discard message attached to the next packet, packet 5, in the example in Petras, that says discard the old one. So Petras is different than us in the sense that there's a deadlock problem, but it deals with it precisely as a fact. Right, but not materially different from what you say you are, for purposes of pre-anticipation analysis. Correct. And I think, in the interest of time, what I would say, again, trying to put these one limitation, one fact, I just, again, can I, I don't, I was asking you to tell me, do you stand here today and say, on behalf of your clients, that if the judgment of infringement is reversed, that we need not reach the question of anticipation? No, because there are some of the JGG group who have positive territory judgment of invalidity, and because the patent could be asserted in the later context against a different product, that would need to be decided. Can I? There's a lot to talk about, but I want to switch to the damages discussion a little bit before, because you've only got five minutes left before you're going to be into your rebuttal. And that's still saving him two minutes, don't worry. But, so let me ask you some questions. Because I've got, it seems like there were some at least odd choices here that were made at trial. I mean, the defendant chose to go to the jury on the RAND issue, correct? I mean, the judge offered to do a RAND analysis, and you all refused to have him do that in any way that would be binding. I think there are two parts to it. There is the latter part where the defendants talked about what the judge should do in the jury rate portion, but the question of the hypothetical negotiation was going to the jury one way or another. And what we said was, if it's going to go, it needs to go with a set of instructions that puts this in the RAND context. And I would just make these points. I'm sorry. You're still, I understand you've got an argument that there's some jury instructions that were missing, but my point is, the judge offered to have a trial in which the judge would either determine a range or determine a rate. And you all said, no, we won't be bound by any determination that the judge makes. Is that right? That's correct in the jury rate portion. Okay. So I do not understand your argument that you put all this other evidence in in front of the judge, and that somehow that meant that the record before the jury wasn't adequate. I mean, if you had evidence on the RAND issues, you should have put it in in front of the jury if you were the ones who chose to make the issue go to the jury. Your Honor, I don't think we've made that argument. And if we did, that was our miscommunication. We did not make that argument. Our argument was the following on RAND. And it doesn't rely upon any of the evidence that went in during the two-hour jury rate portion. It relies upon the request for instructions, basically building on the Innovoxia decision by Judge Holderman and the Microsoft decision by Judge Robarts that said the following three things. One is Georgia-Pacific, which is now almost as old as I am, isn't sufficient to deal maybe with a broad set of patent cases, but you don't need to reach that issue. It's certainly not sufficient to deal with FRAND and RAND issues. And Judge Holderman and Judge Robarts, you know, what we think of – you asked for not only a RAND-specific instruction, but in fact for clarification with respect to standardization value of other pieces, paragraph 9 or item 9 or whatever it is of Georgia-Pacific. Here's my question. Why isn't it wholly without respect to whether a member of a standard-setting organization made a RAND commitment a necessary aspect of calculating a reasonable royalty to exclude the value that came from adoption of the technology as a standard? It should be, and that's what we ask. Right, but that point is not specifically dependent on RAND. RAND is whatever else it is. It's a contract. Whatever its interpretation might be is a matter of people entering into the contract by joining the SSO meant by it. But we have a statutory question about royalties under 284, which might well have a different standard, might in fact have a somewhat more demanding standard. A RAND might in fact take account of standardization enhancement for everything. So why is this dependent on RAND? Your Honor, if I were to take the hold-up and the stacking issue, you might have different answers. But the hold-up issue or the value after standardization for sure isn't necessarily dependent on the party having made a RAND commitment. But the fact that the party did make a RAND commitment is part of the analysis. And Judge Holderman has- But the judge instructed the jury that they did make a RAND commitment. In fact, Judge Holderman in his own opinion says the jury was properly instructed in your case, and so that was all factored in. Now, Your Honor, I think I would say two things to that. If Your Honor considers the two instructions that are A-221 and A-226, and you compare them to actually what Judge Holderman instructed, and to the-for both Judge Holderman and Judge Robart, the additions and deletions to Georgia-Pacific, they are radically different. First of all, those were bench trials, number one. There was never any statement in either of those cases that these are required jury instructions. And certainly we have never said that they are required jury instructions. So we have to remember the context that we're talking about. Your Honor, there was- They did, unlike you, agree to let the judge make the determination, so the judge could do the analysis the judge felt appropriate. Your Honor, let me ask Mr. Newton if he'll cede his- So I'm into my rebuttal-our rebuttal time. Let me answer the question and just make one more point, and then I'll save the rest of my time for rebuttal. There actually was a jury-for Judge Robart, there was a jury trial afterwards. Right. And the jury- To determine the breach of contract, correct? But it was to determine whether there was a breach of contract given a royalty arrangement. He instructed the jury on the meaning of brand and the importance of brand, having done the modification to the- Right. Again, they opted for a different approach, though, than you did. Your Honor, I think saying that we opted for a different approach, we were the descendant. They put in the damage claim. The damage claim had a hypothetical negotiation to them as part of it. We said if you're going to be-if that's going to go to the jury, then there should be instructions both on the value of the patented feature technically and economically as opposed to the standardization value. And we got neither of those. And if you compare it to Judge Robart's articulation of Georgia-Pacific factors, it is just night and day. Let me just make this last point and- I do have a couple questions. And there's a lot more on this that I have questions on. But I do need to ask you a question on this EMBR, because there was something in your briefs that really troubled me, is that you repeatedly referred to counsel's statements about the cost of laptops. And when they call you on it and say you never objected, you come back and say, oh, yeah, we had a continuing objection to that. But you didn't, because that continuing objection was only to references to those other licenses, not to counsel's statements. There was never a single objection to those statements. And yet you tried to say there was. Your Honor, let me say two things. We had a Daubert motion. I understand. The Daubert motion related to the licenses, his ability to reference the licenses. The loose statements that counsel made, which you pointed to in Vordier and other places in arguments, you never objected to. And then you actually asked a witness and referred to the price of laptops. Your Honor, I actually think if you go back and look at the Daubert motion, it was entire market value. That was the issue. The point was the expert was not allowed to rely on those licenses because that put them into the entire market value analysis. And that was denied. Right. That does not cover your ability, your objections to statements of counsel. Your Honor, let me just say this so I save my rebuttal time. If you bring a Daubert motion, and there are many now after loose and unilocked, and you object on the basis of the entire market value rule and the district holds the entire market value rule is not implicated and that the total revenues can go in, if we're going to object every time it comes up, it's going to be a problem. This is a case where there was a Daubert motion. These are apples and oranges, and so I think that your brief was actually not accurate. But putting that aside, yeah, go ahead. Did you make an exhaustion argument, namely that Erickson granted Intel an implied license for free and they can sell these units, and therefore its customers were under no patent restriction from Erickson? And if not, why not? Tell me what's wrong with that.  Is that the question, Your Honor? Well, in thinking about what you've referred to as entire market value, namely the broad contention that the identification of a proper royalty cannot take into account enhancement of the value of the end user product, which I'm not sure how that could possibly be true. A lot of this seems to have to do with what price Intel was able to sell the chips at, which seems to me to have been entirely within the control of Erickson. Erickson decided not to charge 50 cents to Intel for licensing. It said, we know Intel is making the chips that embody the patents. We're perfectly happy with that. Why is that not an implied license that would generate an exhaustion defense? I know that issue isn't here, but I began thinking about it in thinking about how to figure out what can be considered in constructing the royalty. Your Honor, I'd say two things. I think one fact that was in the record is that, as a conscious matter, Erickson did not sue licenses from the people who made the Wi-Fi chips that embody entire patented features and many more. Now, the question of did that impliedly result in exhaustion was not litigated, and honestly, it's not before the court. If there was a covenant not to sue or a license before to Intel, there would be an exhaustion issue. I'll give you a couple minutes for rebuttal, but I do have one more question. The royalty stacking, you referred to Judge Robar's trial. In that case, there actually was evidence relating to royalty stacking. The testimony that you all proffered was extraordinarily weak on this point. It was, well, we assume there might be some stacking. This is number one, and then there might be others stacked on top. There was no actual testimony. It was surprisingly weak. So, I mean, every judge has to look at the record that's actually submitted in front of them. Judge Robar had a materially different record than did Judge Davis. So why should someone instruct on a point that the evidence doesn't raise? Well, Your Honor, let me just focus on the Erickson portfolio to give you the evidence that was in the record. Mr. Bones said the Erickson has 18 patents declared essential. Seven patents were sued on. Five were litigated. Only three were found infringed. If it's going to be $0.05 a unit for everybody who holds 18 patents, this is a multi-billion-dollar case. It's the reason there's so much interest on both sides for the immediate. That is what's important, and that's why the fact, to go back to the patents, the fact that these are declared essential doesn't mean anything about whether they're essential. And think about what happened in this case. Seven patents sued on. Five litigated. Three, and we contend that all three are not infringed. And you're going to allow a nickel of patents for what literally is thousands of patents? This has, to get back to where we started, this has... Again, this is a theoretical argument, but there was not actually any testimony that talked about the fact that anyone had ever, with respect to sacking, that there had been any other license that was demanded. Right? Two different points, Your Honor. Right? Yes or no. Tell me yes or no. Is that true? No, Your Honor, because we have the evidence of 18 declared essential, Erickson seeking a license. There, Ms. Peterson got on the stand and said, we go after the end users. We don't go after the chip manufacturers. And we've gone after them on this basis, and we go after them to get our... Okay, but your argument is the judge should have said that other people could come in and stack, and there is no evidence that anyone else has ever done that, right? No, I... We have to actually look at the evidence that's in the record. Your Honor, the evidence in the record, just looking at Erickson alone, shows the problem of stacking. And all that we asked for was instructions that people engaged in a hypothetical negotiation would have considered the fact that there are hundreds, if not thousands, of patents that have been declared essential by someone or relate when they're determining royalty. There is record in the evidence that shows that the end result of this is that the royalty would be 50 to 100 times more than the cost of the chip. That's in the record. Okay. And if I...  We'll give you four minutes for rebuttal. We'll give another five minutes to the opposing counsel. Okay. May I plead the court? There obviously are many issues involved in this appeal, and we thank the court for your gracious extension of the time in this argument. It's my current intention to cover the points that we've just heard argument about since the court has expressed interest in those matters. And, of course, if there are others that have not been discussed and the court has questions, I'd be pleased to address those. So, shall we start with the most recent thing that we heard about, the damages in royalty stacking? Can I just ask you, I want to talk about the 215. Then let's talk about the 215. Your proposal of the claim construction, which the district court adopted, included a reference to feedback response methods. How does that get into the claim construction if the preamble is not limited? Without the preamble, this second data unit or whatever it is could be anything in the world. Yet you say it's, in fact, a feedback response method. How does that not come from the preamble, in which case the whole preamble is limiting, including its minimizing response method? Well, the preamble does use the expression feedback response, and the court's construction does refer to a feedback response, but I don't think that it's necessarily a principle of claim construction that the court is not allowed to use language of all kinds in the claim construction as long as it's supported by the specification. So the mere fact that the court chose... How is this claim even understandable without treating the preamble, which is the sole reference to the feedback response method, as limiting? And if part of it comes in, why not the whole thing? From the specification. I don't think that... I don't, with respect, agree with Your Honor's supposition there, or Your Honor's basis for that argument, that merely because the court uses the phrase feedback response that it's a necessary implication that the court treated the preamble as a limitation. In fact, the parties, the defendants, didn't contend that the preamble was a limitation. Can I ask you a question on that too? Of course. I'm not going to go through it at length, but hopefully you listened to my colleague. I did, Your Honor. And this technology is hard, so given my interpretation of what 215 does, and your colleague's response that if that's the interpretation, it's covered by the prior art, and that it just can't be that, what's your response to that? That there is not a static type identifier field here because there are three choices in the standard that the designer of the system can use. The minimization element is found in the preamble, but as we've just discussed, there is no suggestion here that the preamble is... You're suggesting that the difference is that the standard allows choices, but my understanding is all of the chips, they don't allow choices. They come with one response. One's designed, correct. Right. But the designer of that chip has available in the standard the ability to minimize the feedback response. But the accused product is the chip. It's not the standard. No, it's not. But nothing in the claim requires that the chip make the choice in order to minimize anything. Didn't you say exactly the opposite of that in so many words, saying the invention is, you know the quote. I know the quote, but there is a choice. The choice is made by the designer of the system who chooses to implement what that designer believes is the most efficient feedback response for minimizing overhead, and that choice was made, compressed block acknowledgement. But there is no language in the claim that in any way... What you said was that the receiver had the choice, not the designer. Well, I can only say that read in that context, that language is inartful because it is crystal clear from everything that happened in this case and every bit of the appeal that the receiver is not what makes the choice. That's not in the claim. What the claim says is that they're responsive to the receiving step. There is constructing a message field, and then it explains that one of the contents of that message field is to include a type identifier field. There's nothing whatsoever in the asserted claim that indicates that the receiver makes any choice at all, and Chief Judge Davis so found in his judgment when he said the claim construction only says that it must identify, not that it makes a choice about different types of feedback. There is a choice in the standard. Can I ask a question here? Because I don't understand your answer. Does the prior art cover a receiver that receives message and then responsive to the receiving step, constructs a message field with these various steps with a pre-programmed type identifier field? Is that covered by the prior art? No. Okay. And why not? Because the field in this situation is not static because there is a choice. This is the leap I'm not getting. It is static for the devices because it's pre-programmed. Once the choice is made, it's static. So if we agree, I'm unclear. Do you think choice is critical to your patent over the prior art? The response not being static is critical, and the ability of the designer to choose something other than a static choice is critical. But if we disagree with you that it's the designer's choice that's relevant, it's the receiver's choice that's relevant, then this isn't infringed. Because the receiver here is not making a choice. I agree. If the court concludes that the receiver must make a choice, the patent is not infringed. Okay. But to elaborate on that just a bit, a careful reading of Claim 1 shows that that can't be the case. Claim 1 requires something happen responsive to the receiving step. What is it that happens? Well, it goes on to explain what happens is constructing a message field. Right. I understand all that argument. It's confusing to me why you're agreeing that choice is in here because I don't see choice in any of the stuff below the preamble, and I'm not sure I even read the preamble as including choice. If we were looking at that interpretation of this language, it seems to me like you have a pretty strong argument. But once you can see that somehow choice is important to the claim dimension, whether it's with regard to the prior art or not, then I have a hard time seeing where they infringe. Well, choice is important if the preamble is treated as a limitation. Now, we don't agree that it should be. The defendants haven't really contended that it should be. But if minimize is imported as a limitation into the claims via the preamble, then there has been minimization here because the designer chose the type of feedback that it believed minimized overhead. In response to Your Honor's question in the previous argument, first of all, as I hope that I've explained, we don't believe that the preamble is a limitation and that minimization should be imported. However, under the circuit's precedent, even if the court determines that the preamble is limiting and that minimization is a part of the claim, if the evidence of record shows that that new element is met, this court may affirm the finding of infringement. And we believe, as we've explained, the fact that there has been a choice, the fact that the designer of these systems has been able to achieve minimization through the selection, in this case of compressed block acknowledgment, satisfies that limitation even if it's to be imported by this court. When did you first give the defendants notice that you viewed the technology in all three of the patents now at issue as essential to the standard? I don't honestly remember that date, Your Honor, because of course there are a number of different defendants and all of those communications happened separately. There is a stipulation of evidence in the record that sets forth the notice that was given, the claims that were made, and I believe it includes for all of the defendants the accusation that the technology is essential to the standard. At some point during the case, you made that clear, is that right? Yes, Your Honor. Do we believe that these three patents are essential to the standard? Yes. Yes, absolutely. You didn't ask the judge to make a separate determination as to essentiality. You both argued that to the jury? Yes. Okay. Answer me some questions about the 568. It says that it identifies the type of payload. I'm having a hard time understanding how a loose correlation with identifying payload can be enough. Okay. With respect, Your Honor, there isn't a loose correlation. It's an occasional correlation, and let me explain what's going on here and the confusion in the briefing created by the quotation of some of our expert witnesses' statements that the system doesn't really know what the payload is based on the traffic identifier. The standard requires in Table 9.1 of the specification a traffic identifier 0 to 7. That is not optional. It must be included in every packet. Every transmitter must include that traffic identifier 0 through 7, and every receiver must check and receive that. All right. That's a traffic identifier as opposed to a payload identifier. That same section of the standard, in what it describes as informative, not required, associates traffic identifiers with the content of the payload, data, video, or voice. Some applications choose to use that association. For example, some applications do not. For example, if we're talking about an application that's e-mail that's only carrying data, that application may really not care about prioritizing the packets because a brief delay in the transmission of that kind of data isn't important. It may choose the designer or the author of those applications running on the defendant's products may choose not to use that association. However, other applications do find it important, such as Skype, a video conference call over a computer. There, it's very disruptive to the call if there's any delay in the transmission of voice and somewhat disruptive if there's a delay in the transmission of video. Those applications may choose to use the association and to associate the traffic identifier 0 through 7 as suggested in the specification. Was there, other than that they may choose, was there actual evidence of choosing? Absolutely, Your Honor. That came from our expert witness who performed testing on at least four separate programs, C-SIP Simple, Skype, Akiga, and Q-Wave. He testified that he tested those systems and that those applications chose to use the functionality of associating the traffic identifier with the content of the payload. But he didn't, and I gather, tell me this is wrong, couldn't have testified that by looking at the identifier, one could tell what the payload is. By looking at the identifier alone. Anybody can use it, and that's what, isn't that what it means to be an identifier that identifies the payload? By looking at the identifier, you can tell what the payload is? No, Your Honor, not in this concept. What he testified was, if you simply put a device, a sniffer, in the midst of the data transmission, and you don't know whether the applications on either end have chosen to use this feature, then you can't be sure that the traffic identifier, which you will see, is or isn't being used to identify the content of the payload. But the applications know that. If you're sending a Skype call, the transmitter and the receiver know that the type identifier is being used to identify the content of the payload. An observer, simply looking at a transmission, without knowing whether it's coming from Skype, or an email program, or something entirely different, has no way of knowing that choice that is being made by the applications. But, the important point here is, that at all times, these accused products are capable of carrying out that functionality, and because they are reasonably capable, the apparatus is intrinsic. Do you happen to have available a specific citation for your experts saying, not only that these applications happen to use particular 1-7 type identifiers for particular types, but that the applications are programmed to recognize the type by virtue of the type identifier? I believe that, Your Honor, is contained within A1395-96. Now, I wasn't reading that section of the record with a precise answer to that question, so it's in the record, but I believe that's where. Do we really need to get into this whole discussion of capability claim limitations if, in fact, we have, as you say, evidence of it actually occurring? No. All right, assuming we were going to look at this capability, concept, what is it that distinguishes a capability claim from a non-capability claim? Just the use of the word for it? The drafting of the claim. In this case, a processor for arranging information. Therefore, a system in which the processor is instituted for arranging information and to do the matters set forth in the rest of the claim, under the FinJAN case, that is a claim drawn to capability. Okay. I agree with you, Your Honor. This is really a belt-and-suspenders argument. Since there is proof that the accused products, depending on the choices of the application, actually perform as the claim describes, you don't really need to get into the capability issue, but the accused devices would be infringing because they are reasonably capable, even if there were no proof that that's actually used in that way. Okay. Can we shift to the images question? All right. Let me ask you about the entire market value question. First, putting aside whether I think there were proper objections that were made to counsel comments, it does seem a little inconsistent for you to argue to the trial court in connection with the Daubert motion that we're not implicating the entire market value rule here. We're not arguing that. We're not arguing for a base that implicates the entire market value rule, and then repeatedly refer to the $1,000 cost of laptops. Your Honor, with respect, I would respectfully take issue with the word repeatedly. I think that it was said twice. And second, that reaches one of the two dangers that this court has articulated or presented by failure to adhere to the entire market value rule. The first danger being the danger of capturing unpatented features. The second danger being what the Unilock case described as the $19 billion cat that could not be put back in the bag. The comparison of the total overall revenues of the accused product with a presumably modest royalty rate. And in that case, the court found that comparison, which happened to be $19 billion in overall revenues, was prejudicial and could not be cured by argument. So your view is that if you're only talking $1,000, it doesn't make a difference? Yes. My view is, first of all, the context of those remarks. Every time they were made, if your Honor reviews the record, were not, please, ladies and gentlemen, understand we're only asking for a little money compared to $1,000. That wasn't the purpose of those remarks in context. The purpose was to explain to the jury how the per-unit royalty Erickson requested worked. That it did not vary depending on the price of the accused product. And the statement to illustrate that was, it's the same 50 cents whether the accused product is a $100 router or a $1,000 laptop. In that context, there was no efforts in those statements to encourage the jury to view the royalty as de minimis compared to the overall product income of the accused product. In fact, there is no evidence in the case in which the jury was ever informed of the amount of overall accused product revenues. With respect to the entire market value rule jury instruction, I understand that you think the entire market value rule wasn't implicated, but what would have been the harm of allowing a jury instruction just explaining how it works, so that to the extent that there might have been confusion based on your expert's reliance on those other licenses, that confusion would have been obviated? Your Honor, in all candor, if the standard in this proceeding today was, what would have been the harm with giving some additional jury instructions? I'd have a really hard time in telling this court that under some circumstances, some judge might not decide to do that, and it might be proper. But of course, that's not the standard of the issue that's before the court today. The issue is, did Chief Judge Davis commit reversible error, harmful error, by refusing to give the additional instructions that the defendants requested? And I think that the answer to that is clear from a review of the instructions that he gave. In this context, I think that it's very important to put this issue of the FRAND obligations and how they relate to traditional jury instructions into a historical context. I'm sorry, so now we're shifting from end product value to standardization value. That is from hold up to entire market value to FRAND, et cetera. Before we do that, can I ask you the same question about exhaustion that I asked? Yes, Your Honor. I asked Mr. Lee, why is it that when you knowingly allowed Intel to make chips practicing your patent, that's not an implied license that exhausted your patent interest in those chips? All I can say, Your Honor, is that's an interesting question. I have never heard of any precedent for the proposition that a party's forbearance from suing a defendant who may be infringing constitutes a covenant not to sue or an implied license. Judge Davis, Chief Judge Davis, in his judgment, specifically considered this issue in the face of Intel's complaint, not dealing with exhaustion, but complaint that Erickson allegedly would not license Intel and would not negotiate with Intel. And in finding that that was not true, Judge Davis said that he was aware of no authority and the defendants had presented no authority that any party was obligated to sue an infringer or obligated to seek damage from them once they intervened. So my answer, Your Honor, is I don't think that it would be an implied license. I think that it takes far more, under any authority I'm familiar with, to create an implied license than simply a party saying, we're not going to sue chip makers, we're going to sue the product makers. All right, with respect to the Rand issue, the defendants refused to agree or be bound by a Rand determination by the trial court judge. Did you agree to be bound by a Rand determination? Yes, Your Honor. Okay. All right, so you have to go to the jury and you have to go to the jury on all the issues. All right, well, the parties agreed to submit the defendant's contract claim on the alleged, Erickson's alleged breach of its Rand obligations to the court. Right, okay. That was tried to the court. Chief Judge Davis found that Erickson had not violated its Rand obligations and that the defendants had failed to negotiate in good faith. It might have made for a more informed jury if all of that went to the jury, but I can't second-guess counsel's stipulations, if they are what they are. That's right. But with respect to the Rand issues then, clearly both sides had an opportunity to raise any arguments that they wanted to raise to the jury. Were there any restrictions that the judge put on either party with respect to the Rand arguments that they could make or the evidence they could present? Not at all, Your Honor, and those arguments were made. The defendants argued that there was the danger of hold-up here because the value of the patents was attributable to adoption of the standard and not the value of the technology. The defendants in the evidence as well as in argument said to the jury, I can't recall the exact number, but I think it is, that they posited you might have $30 or $40 in royalties on a $2.50 chip. That was argued and presented in the evidence. When the defendants made the argument that standardization value had to be subtracted out, did you say, oh, no, it doesn't have to be or it was? No, we did not. What we said was. If you did, how is it that this seemingly fundamental fact or piece of law, actually, if it's the correct rule, cannot be told to the jury with the authority of the law rather than letting the parties fight about whether technological value has to be distinguished from standardization value? Again, with respect, Your Honor, the issue before us today is not whether or not the jury can be informed of that. The issue is was it reversible error to inform the jury. I'm sorry. Maybe there were too many negatives. How is it possible to leave to the parties and the jury the argument and decision about whether standardization value has to be excluded? Because it's accommodated in the Georgia-Pacific factors and the instructions that the judge did give to the jury. Where do you think it's accommodated in the Georgia-Pacific factors? Hold-up, Your Honor. What we're talking about here is the value of standardization and the alleged ability of the patent holder to charge supra-competitive royalties. Well, it's not necessarily even hold-up. It's that there's a trade-off because the patent holder gets an increase, presumably, in market. And so, as a result, that could skew what would appear to be the normal value. But, Your Honor, put your finger on a very important point. The principal value delivered by standardization is an increase in the number of infringing products. Can you point me to jury instructions where a reasonable juror could figure out all this? I looked at them. I mean, this stuff is hard for me. I don't understand reading that jury instruction that it would tell me at all to exclude the value of the standardization. It wouldn't do so in those terms. But Judge Davis did take pains under Georgia-Pacific factor 15 to instruct the jury that you have to consider the position of a willing licensor and a willing licensee as the judge observed. But how would a juror know that that doesn't allow them to negotiate and include the after standardization value? You agree that it's error to allow them to include the value from the standardization. In the rate, not in the base. Okay, but even in the... That's fine. I don't think that's an important distinction for purposes of the jury instruction. The rate must be attributable to the value of the invention. The base may be greatly increased due to the value of the fact that it was standardized. In this case, Erickson presented evidence of a number of license agreements negotiated at arm's length... Can I just get you back to the jury instruction? Because this is really what I'm asking about. Where in the jury instruction specifically do you think that a juror would have understood them to direct them to exclude the standardization value? Georgia-Pacific factor number nine. And I'm sorry, I don't have a reference to where that appeared in the court's jury instructions. But he gave all the Georgia-Pacific factors. I honestly don't have those committed to memory. Okay. But I assume it doesn't say anything about excluding standardization. He did not. Let me be clear. Chief Judge Davis did not, using the terms, either hold up or exclude from your considerations an increase in rate due to standardization. He did not use those words. But if I may retreat back to the point that I was making five minutes ago, this issue about patent damages in the context of standardization is not new. There have been nationwide standard-setting organizations up and running and in business since 1901. Standard-setting bodies have been active for 70 years since the Georgia-Pacific factors were first enunciated. And throughout the 32-year history of this circuit, standard bodies have been incorporating patents into technological standards. This is not a new issue. As long ago as 2000... It is a new issue in this court, isn't it? I mean, there's no case in which a party has said when the patent is covered by a standard that the jury instructions need to tell the jury that the economists, the experts, actually do need to find the best means possible, reasonable means, of segregating the value that comes from the fact that everybody kind of has to use it from the value representing the technological improvement over alternatives. I'm aware of no case that's ever said that, Your Honor. So it really is... In terms of a legal issue, it's a fresh issue. I can't agree, Your Honor, because the Georgia-Pacific factors have been used for decades, including in the context of standard... Well, maybe just because someone didn't think to raise the issue before doesn't mean that it's not something we should address. I mean, there are lots of things that parties finally figured out after years of trying cases, perhaps improperly. I would never be so bold as to suggest this court not address anything that it considers appropriate. But I do disagree with the presupposition that this is something new. This is something that technology has driven us to and that the courts must respond in a new way to account for these issues. These issues have been around for decades, and this circuit has a long history of precedent in instructing juries about reasonable damages. The instructions that Chief Judge Davis gave were consistent with that precedent and accomplished the goals of standard setting in that they protected the patent holder, the innovator, by providing a reasonable royalty and protected the alleged infringer and the public by making sure that that royalty was reasonable and under the proof in this case had gone through the acid test of actual lengthy negotiation by specific negotiators who would have been entirely capable of saying, wait a minute, Erickson, we're not going to pay you these tens of millions of dollars because what you're asking us for is attributable to adoption in the standard law. Isn't Georgia Pacific Factor No. 5 misleading in this context? The one that talks about the commercial relationship between the parties? I don't see why. It doesn't mandate any particular conclusion as a result of the admonition to consider the relationship. The licenses that your expert relied on, at least half, as I understand it, were actually negotiated after the final version of the standard. I don't know when the others were, whether they were at a time... Some before and some after. Maybe even the earlier ones were at a time when people knew that this was going to be in the standard because it takes a long time. Your expert didn't make any effort to say when the parties sat down and negotiated. Of course, at that point, they know what they have to do. They can't negotiate about, well, we'll walk away from the table if you're charging us more than we think the technological improvement over some different type identifier would be. They have to do it. They have to do it if they want to practice the standard. I agree with that. But they don't have to agree to anything that Erickson asks. There's evidence in this case that Erickson, in the course of negotiating its license agreements, never heard a complaint about holdup from the licensees and no evidence to the contrary. Right. That may just be an artifact of the fact that holdup is a politicized, soundbite-y term that conveys a lot of this is really stinky message. That's a good quote. That's why people choose terms. But the question, what is the technological value attributable to the technological improvement is not the question that negotiators in this business of making products would be asking themselves and saying at the time that this is already in the standard. They're trying to figure out what do we need to pay to stay in business to make a product compliant with the standard. I respectfully disagree, Your Honor. The negotiators would and did say, why does this 215 patent contribute any value to us? Can we save money? Is it more efficient? What's the metric at which we're going to arrive at a dollar value that we're actually going to pay for? What they did not do was to go through the exercise that Your Honor is positing, which is to say, well, it's in the standard now, so we've either got to pay everything Erickson asks without negotiation or we've got to reach into the air and say, well, this is the additional standardization value. How does anyone know that? What they know are the hard facts of the negotiation. True, the licensee may be very motivated to enter into a license agreement if it's in the standard and they want to practice the standard. Right, but what that suggests to me is that real world licenses negotiated in the shadow of the standard may not, in fact, be terribly informative about the proper 284 royalty value. Well, Your Honor, what I would say in response to that is, of all the decision makers available to us here, the jury, the trial court, and this honorable court, and negotiators at Hewlett-Packard, who do we believe is most capable of isolating the value of these inventions to Hewlett-Packard? Anything else? All right. I shortchanged you, and I'm going to blame it on you because when you got to the yellow light and you said, I'm in my rebuttal, you actually weren't already in your rebuttal because we started at a different time. All the courtroom courts do it differently, and I did not understand that. So you actually have a total of nine minutes left. So you can, because I shortchanged, you had four minutes left on your 30 when I cut you off, but I gave them an extra five, so now you've got nine. If you give any of that to Stell, which you can, I do, in fairness, you just have to let them respond for an equal amount of time. You're right. I'll accept responsibility for it and take the nine minutes. But I apologize. It may have been my fault, too. It wasn't really your fault. I just needed somebody to blame. In exchange for five minutes, I'll accept the blame. Let me make five points. First, I'm going to judge Hughes' question, the 215 patent. Let me read you a quote, and this is repeated by counsel in their pretrial statement in their briefs by their expert, and the quote is, of the 215, the invention is, as expressed in the claim, giving the receiver a choice. And that's at A6478. It's at A6473. It's at A6474. It's at A6477. It actually is in the Markman opinion, Your Honor, at A802, where the district court described Erickson's point, which is, Erickson contends the invention is the creation of choice at the receiver. And they said it in the pretrial brief and in the evidence. And that is the key because as Mr. Colley said, if the receiver must make a choice, there's no invention. And we believe that the intrinsic evidence established that the receiver must make the choice and there is no invention. Let me go to the 568 patent, which I did address at the outset, which Mr. Colley did, and make these points. Judge O'Malley, there is no proof that any of these applications actually operated in accordance with the claim. Didn't their expert actually do the testing, the analysis? Yeah, and what he did, Your Honor, is on two pages they cited to you, described in general what they did at age 1395 to 96. But at age 1647, he actually tells you what it shows. And his analysis for Akedia, which is the program, the application program that he put on top of the system, was that for TID value 0, it was video. But that doesn't correspond. But for TID value 5, it was video, it did correspond. It was a complete coincidence. The claim limitation requires that the TID actually identify the type of data. At the Markham hearing, Erickson contended that all you had to do was identify the characteristics. And Judge Davis rejected that because the type of data, the specific type of data, was important for two reasons. One is that's how they distinguished the prior art. And at age 18 and 19, Judge Davis says explicitly that. The second reason is this. If you read claim one, the transmitter is identifying this type of data. And the specification makes clear the whole purpose of this is so that it gets transmitted to a receiver. The receiver knows what type of data it is, and then it can do something with it based upon the type of data. At age 14-06, their expert conceived what is exactly the same thing we said, which is you look at the TID value, you cannot tell what kind of data it is. It may be, it may not be. It's like in algebra used, it's a broken clock that twice a day may coincidentally have the correct time. Did their expert testify, and I didn't, at least my quick re-reading did not see it at 1395-96, that in the particular applications, whose names I don't remember, that he said he tested, that the application reads the TID number as an identifier of payloads because that's what it chooses to do. I think that's why what he says at age 16-47 is so key, because this is where it says exactly what is true, which is there is no, there may be a coincidence that there's no identification. There's not even a correspondence. And John, this is because if you read the claim, the transmitter is identifying this information for a reason. And the specification makes clear that the receiver then refuses it. In our system, the TID has no, does not identify the payload information. We don't need it. And at the receiver, Your Honor, the receiver never says what type of payload information do you have because it's not relevant to A12.11n. So again, this is one claim limitation. The service type identifier and literally one fact. Tell me exactly where you are at age 16-47. What page, what line? At age 16, can I get the copy? If I start, Your Honor, ask me at age 16-47 and I start you at page 33 in line 19 and you continue down to page 34, line 21. And Your Honor may recall that in the informative designations in the standard table 9.1, five is video, but zero is not. And when he did the experiment, by coincidence, one of them, one five turned up video, but one zero, which in the standard is not video, did not. That's because it is like the broken clock. And the analogy to broken clock, it's as if the claim read a clock which identifies the correct time. This never identifies the payload information. It's because we don't need it. And Your Honor, that's why... Even a blind squirrel gets a nut now and again. Is that what you're saying? Yes. Basically, Your Honor. And you know, actually with the broken clock, the only way you know that coincidentally it's actually right twice a day is if you actually have a clock that works. And we don't have, we don't identify the type of payload information. Dr. Nettles at 1406, and I don't think it was as equivalent, I have great respect for Mr. Pauly, but it's not as equivalent as he said. He was asked point blank, if you look at the TID value, can you tell what the payload information is? And he says, no, you can't. And I think you go to Judge Toronto's question. There's a difference between saying a conclusion, which is the TID equals the service identifier. The underlying fact is not in dispute. It's no identification. Third point to go to, the damages issues. Before you get there, can I ask you a question? Sure. What if we were to agree with you on some of the infringement arguments, but not others? So in other words, we'd say, you're right, one patent, there's no infringement, but say, as the other two there is. Putting aside all the other issues you have with respect to damages, does that impact the damages calculation? The number of patents infringed? It would, Your Honor. I mean, I think that I think the best way for me to answer is this. I think that if you consider the three and the possibilities are 0, 1, 2, 3, but if it's some mixed, some infringed, some not, then the court would have to reach both the entire market value damages and the random instructions in order to guide the determination next time around. And that actually leads to my next point. The Rand issue is a new issue. The number of amicus briefs you've seen, it's not because the patent issues are complicated, as Judge, you said, and they're interesting, but we're here because of the Rand and entire market value issues. And all of the amicus briefs are about this. Judge Holderman and Judge Robards, I think, issued really scholarly opinions because it's a new issue. Okay, can I ask you, in those cases, were those contract claims for violating a Rand commitment or were those patent claims in which Rand was discussed as relevant to the interpretation and application before? A little bit of both. Microsoft was a contract claim. And the Boshua was a little bit of both. And that's, and Judge O'Malley is right in terms of the manner in which things were determined. But to go to, Judge, who's the question is Judge O'Malley's. I like being right, so just let me ask you one thing. Sure. Would that, would I, am I right that if the contract question had been tried to the jury at the same time you were discussing the damages on the infringement, there would have been no question about how fully informed the jury was about the whole Rand process. There would have been a different answer to your question. And one of the things I did want to mention, to be more precise, the question you asked about were the stacking and all the patents before the jury. And the answer is yes. It came in during our damages experts testimony today, 1608. And beyond the 18 Erickson patents I mentioned, literally 977 were part of that. But to skip back if I could, just to the, to the Rand issue very quickly. Factor V and Factor IX, which I think Judge, Mr. Collier mentioned Factor IX to you. Your Honor, you mentioned Factor V. They are actually a great example of why Georgia Pacific doesn't work. Factor IX is the utility and advantages of the patent convention over older models. I mean, the utility and advantage of the patent convention is more valuable than prestandardization because of standardization. And you'll see we propose typically what I would call a Judge Robart's edition of that instruction. And on Factor V, Your Honor, we ask that the instruction be that this occurs in the context of Rand. And I think that is different than the normal hypothetical negotiation. What, what more should the jury have been told besides the instruction that the two references that the trial court gave? Your Honor, I think and we made specific proposals there. We added, to go to Judge Toronto's question, we added the portion that says for each of the factors where it would apply, you should consider this factor in light of the technical contribution of the patent invention, not its value after. And then That was your addition on 9, at 6641. Yes. And then our addition Which is not dependent on Rand. It's not dependent on Rand. I think the fact that there's Rand helps, but it's not dependent on Rand. The stacking is more dependent upon Rand. And we ask that the jury be instructed that in the hypothetical negotiation, the licensor and licensee would consider the fact that there's a thousand other patents out there. Right, but as to stacking, I mean, certainly there were lots of arguments that you all made that there were all these other patents out there and they had to take that into consideration. But I think the one thing that Carly kept coming back to which is true is that the question is in light of at least the limited record that you put on with respect to stacking. Is it really prejudicial error in this case? We can't set, we're not going to set down and say every jury instruction has to look exactly the same. That's part of the problem with Georgia Pacific. Everybody thinks they have to recite it over and over. We've said you don't have to but they keep doing it. The answer is that I don't think we're asking to articulate a precise formulation for all but what we're saying is Georgia Pacific which is now 50 years old isn't sufficient to instruct the jury on the questions for instance of people sitting down when they know that there's 977 other patents out there. It's a hard concept for lawyers. It's a really difficult concept for jurors. And then if you actually compare what we ask for on these two issues, the value of post rather than use hold up I'll call it the value post incorporation and stacking and then compare it to the other Georgia Pacific factors where someone has thought that legally we need to give the jury some guidance. These are actually more important in this context. Very last point is this. On the entire market value rule we thought your honor we had actually stated the objection at 1437 to 1438 in our footnote but let me say this. The entire market value is not just the billion dollar number. It's an analytical framework. An analytical framework where the court has held two very simple propositions. If you're going to rely upon the total revenues of the product then you must show that the patent teachers drive demand. We both agree that there's no evidence here that these three patents drive demand for the products. So the second principle is have you apportioned and they have not. The judge actually concluded that there was at least apportionment or recognition of the need for apportionment in the expert's testimony. So the question is did you ever ask for a limiting instruction at the time of Mr. Boone's testimony to have the jury told that don't be confused by the fact that these licenses are being introduced because the patent teachers have said that they're the first objection to the licenses. Then they say we are also about to commit to testimony about the calculations for royalty rates from these. And they're based on the price of the products in total and percentage royalties. We object. Did you ask for a limiting instruction? I can't recall as we stand here but we'll check. I don't recall. As I read your brief you say the trial court could have fixed this problem with that one jury instruction that you proposed? It would be an instruction but we could have made the argument based on the entire market value rule. I think the end of the answer to your question and the last point to make is the apportionment that's required. The first principle is if you're going to invoke the entire market value it will show that your patent is in place. If you can't do that you have to apportion something. The apportionment is the value of the patent to the royalty base you're using. They apportioned licenses between 802.11 and 802.11n and they used an agreement they had with the licensing broker to try to assign some value to 802.11n. It had nothing to do with apportioning based upon the value. The instruction you're correct. The instruction that we asked for the question. Interestingly Judge Holderman allowed in all these licenses that were based on the total end product but ultimately concluded they weren't very informative. Isn't it just as likely that that's exactly what the jury did here because those licenses ranged from 50 cents to $1.50. The plaintiff's expert asked for 30 cents and the jury came back at 15 which isn't really far off the ranges that either Judge Holderman or Judge Holderman were capable of doing which is to understand that those licenses are arguably relevant but ultimately not that meaningful in the calculation. Your Honor, three quick answers since now I'm for sure over time. One is those licenses were not by definition comparable. That's the motion. Here's the reason why. The one license that was discussed was the HP license. Tens of thousands of patents. The only allocation was made by lawyers after the litigation started. That's not what the court was talking about. Second point is what this court said is the licenses need to be technologically and economically comparable. He then determined that they were not. With a jury there is a gate keeping function for the court to perform. The third I think is the most important is at the end of the day with the courts, this is not as new. It's new in the last five or six years. What this  said is the patent features to whatever the world case is. Mr. Bone's analysis is all based upon allocating license patents. Thank you. The case will be submitted. All rise. The court has determined the defendants         defendants no comment until the court is adjourned. The court is adjourned.